HARRISON *et al.* *v.* TATE *et al.*

HARRISON *v.* TATE *et al.*

1. The defense in each of these cases turning upon the true meaning of two written contracts, to arrive at which it was essential to construe the same together, and their meaning, when thus construed, being unambiguous, parol contemporaneous evidence to explain the same was inadmissible; and no sufficient or satisfactory evidence was offered to show that subsequently to the execution of the second of these contracts any new and distinct agreement between the parties had been made.

2. The court properly construed the instruments in question, and committed no error in directing verdicts in the plaintiffs' favor.

Argued January 23,—Decided March 4, 1897.

Complaint on notes. Before Judge Reid. City court of Atlanta. May term, 1896.

*Harrison & Peeples* and *John L. Hopkins & Sons*, for plaintiffs in error.

*R. N. Holland* and *Anderson, Felder & Davis*, contra.

FISH, Justice.

On March 27th, 1884, F. C. Tate, William Tate and S. C. Tate, by written instrument, leased for ninety-nine years, with privilege of renewal in perpetuity, to Clements and others, all their interests in the marble in certain lands, describing them by number, section and district, in Pickens county, Ga. The consideration was $23,000, and in addition thereto a royalty of three cents per cubic foot on all marble quarried and sold from these lands, the royalty not to be less than $2,000 nor more than $3,000 per annum payable quarterly, and if not paid within thirty days after maturity the lease was to be forfeited and the marble to revert to the Tates. On February 11th, 1891, William and F. C. Tate entered into the following contract with James P. Harrison:

"Georgia, Fulton County.—Be it known that Wm. and F. C. Tate of Pickens county, Ga., and Jas. P. Harrison of

Fulton county, Ga., agree and contract as follows to wit:
Wm. and F. C. Tate agree to assign and transfer to Jas. P.
Harrison an undivided three fourths ($\frac{3}{4}$) interest in the
lease of the marble interest in lot of land number three
hundred and twenty-two (322) in the 5th district and sec-
ond section of Pickens county, Ga., an undivided one half
($\frac{1}{2}$) interest in the lease of the marble interest in lots num-
bers three and thirty-six (3 & 36) in the fourth district and
second section of Pickens county, and to guarantee the pay-
ment of twelve hundred dollars per annum from said inter-
est to be assigned, during the continuance of said lease, to
said Harrison, said sums to be collected and applied as here-
inafter stipulated.   The lease hereinbefore referred to is the
lease made by Wm., S. C. & F. C. Tate to Henry C. Clem-
ents and others on March 27th, 1884, and which was re-
corded on March 29th, 1884, in the office of the clerk of the
superior court of Pickens county, Ga.   The said Wm. &
F. C. Tate further agree to convey to said J. P. Harrison
three fourths of the reversionary interest to the marble of
said lot 322, subject, however, to the rights of Samuel Car-
ter; and also to convey to said Harrison one half of the
reversionary interest to the marble on lots three and thirty-
six above mentioned; said conveyance to be by warranty
deed except as to 2-21 parts of the marble interest in lot No.
36 to which they are to give said Harrison a quitclaim.   The
term 'reversionary interest' as used above means the interest
in the marble upon said lots, subject to the lease above men-
tioned.   Said Wm. & F. C. Tate further agree to convey to
said Harrison by warranty deed an undivided one half in-
terest in one hundred and twenty acres of lot 290 in the
5th district and second section of Pickens county, being all
of said lot except the forty acres deeded to John Hendrick,
as appears in Book "D," p. 213, of the books of deeds in
the clerk's office superior court of said county of Pickens;
also the undivided one half of sixty acres of lot No. 287 in
the 5th district and second section of Pickens county, being
the sixty acres deeded to James Vaughn and Caleb Griffith,
as appears of record in said clerk's office in deed book "C,"
pp. 182 and 183; also eighty-nine acres more or less off the
east side of lot 254 in the 5th district and second section of
Pickens county, and fifteen acres of lot No. 287 in the 5th
district and second section of said county, more particularly

described in a deed from W. B. Tate, adm'r of Caleb Jones, to F. C. Tate; also lot No. 306 in the 12th district and second section of said county, except one half the mineral interest therein, reserving to F. C. Tate the privilege of getting firewood therefrom for his personal use and that of his family; also twenty acres of lot 307 in the said 12th district and second section, lying opposite the present residence of F. C. Tate, bounded on the north by the Bull Gap road, east by what is known as the W. H. Simmons property, and south by the Marietta & North Georgia R. R., said tract being somewhat triangular in shape, running to a point where Bull Gap road crosses the railroad.

"The consideration of the above agreements is, that the said Harrison has already paid the sum of one thousand dollars, the receipt of which is hereby acknowledged, and he is to give his promissory notes payable to F. C., Wm. B. and P. M. Tate, of the date of this contract, one for one thousand dollars payable in sixty days, one for fifteen hundred dollars payable in four months, one for fifteen hundred dollars payable in six months, one for five thousand dollars payable within twelve months, one for six thousand dollars payable within eighteen months, and one for six thousand dollars payable within two years; the three first mentioned notes to be endorsed by Z. D. Harrison, and all the notes to bear interest at the rate of six per cent. per annum from the date thereof. It is further agreed that Wm. and F. C. Tate are to collect the rental accruing on said lease until the final payment herein provided for, and deduct the amount thereof from the note last to fall due. The said F. C. Tate is to have the right to the farming interest in said lot 305, until the maturity and payment of the notes above mentioned. It is expressly understood that nothing herein contained is to interfere with the rights of the said Clements and others or their assigns under the above mentioned lease; and that the guarantee by Wm. & F. C. Tate as to the payment of said twelve hundred dollars per annum is not to extend or be binding beyond the time of a forfeiture of such lease by said Clements and others or their assigns, should such a forfeiture happen.

"The words 'three fourths' and 'to' interlined before signing. This February 11th, 1891.        Wm. Tate,
    "Witness: W. B. Tate,                F. C. Tate,
                P. M. Tate.              Jas. P. Harrison."

"February 24th, 1891. Received and accepted in lieu of the notes mentioned in the foregoing contract, the following notes, to wit:

"One for $955 due two months after date.

"One for $1,500 due four months after date.

"One for $1,500 due six months after date.

"One for $4,000 due twelve months after date.

"One for $1,000 due twelve months after date.

"One for $6,000 due eighteen months after date.

"One for $6,000 due twenty-four months after date.

"All signed by Jas. P. Harrison, and the one for $4,000 due twelve months after date endorsed by Z. D. Harrison, and all drawing six per cent. interest from February 11th, 1891.
F. C. Tate,
P. M. Tate,
W. B. Tate."

On February 11th, 1892, the Tates and Jas. P. Harrison entered into a second contract, which was as follows:

"Whereas William and F. C. Tate agreed to sell to J. P. Harrison certain marble and other interests in and to lots of land numbers three and thirty-six in the fourth district and second section, and three hundred and twenty-two, two hundred and ninety, and two hundred and eighty-seven, in the fifth district and second section, and other lots and parts of lots of land in Pickens county, all of which are fully set forth in a contract made by said parties on the 11th day of February, 1891, and whereas said Harrison gave to F. C. Tate, W. B. Tate and P. M. Tate certain promissory notes, the said notes being the purchase-money for said land, and whereas some of said notes are now past due: it is hereby agreed by and between the parties of said contract, the holders of said notes, and Z. D. Harrison, endorser on one of said notes, that in consideration that said notes falling due between the date of said contract and the first day of December, 1892, will not be sued or put out for collection by said Tates until said first day of December, 1892, said J. P. Harrison agrees that all of said notes given for said land falling due before the 1st of December, 1892, or now due, shall draw 8% interest instead of 6% interest after they fall due or from the date they fall due, except the note endorsed by Z. D. Harrison, which shall draw 6%; and that the title

to the lands described in said contract of February 11th, 1891, shall remain in Wm. and F. C. Tate until all the notes given therefor are fully paid.

"This Feby. 11th, 1892.                    P. M. Tate,
                                           W. B. Tate,
                                           Jas. P. Harrison,
"Assented to.                              F. C. Tate,
     Z. D. Harrison.                       Wm. Tate."

On December 13th, 1892, F. C., W. B. and P. M. Tate brought two suits in the city court of Atlanta: one against Jas. P. Harrison as maker, and Z. D. Harrison as endorser, on the note for $4,000, dated Feb. 24th, 1891, and due twelve months after the date thereof; and the other against Jas. P. Harrison, on the six notes signed by Jas. P. Harrison alone, dated Feb. 24th, 1891, and due at different times. To the petition in the suit last mentioned a copy of the contract of Feb. 11th, 1892, was attached as an exhibit. Jas. P. Harrison filed his pleas alleging, substantially; the following, viz: that the consideration of the notes sued on is stated in the contract of Feb. 11th, 1891, a copy of which is attached as an exhibit to his pleas; that the material part of said contract, and that part without which he would not have executed the notes, is the agreement, (1) to transfer and assign the undivided interest of F. C. and Wm. Tate in the lease of the marble interest in the lots of land numbers 3, 36 and 322 mentioned in said contract, (2) to guarantee to him a payment of $1,200 per annum from said interest during the continuance of the lease mentioned in the contract, (3) to convey to him, by warranty deed, the reversionary interests of F. C. and Wm. Tate in the marble in said lots of land, (4) to convey to him, by warranty deed, the other lands described in said contract; that no transfer and assignment to him of said interests has been made, that no guaranty has ever been given to him, and that no warranty deed, either to the reversionary interest in the marble, or to any of the lands described in the contract, has ever been delivered to him; that the agreements on the part of the

Tates to make said transfer and assignment, to execute said warranty, and to convey by warranty deed said reversionary interests in the marble and the other lands described in the contract, were conditions precedent to the payment of the notes sued on, and that such was the understanding and construction of said contract by the parties thereto, as is shown by an agreement made between him and the Tates, dated Feb. 11th, 1892, a copy of which is attached to the pleas as an exhibit. The pleas further allege that the lands referred to in the contract of Feb. 11th, 1892, title to which was to remain in Wm. and F. C. Tate until the notes should be paid, did not include the marble interests covered by said lease, and that the lands so referred to constituted a very small part of the consideration for the notes, at most not exceeding $2,000. The pleas further allege that at the time the defendant made and delivered the notes, and frequently thereafter, F. C. Tate, with whom defendant made the contract of Feb. 11th, 1891, and to whom he made and delivered the notes, agreed and promised that, in consideration for the notes, he, F. C. Tate, would secure from S. C. Tate, the owner of the balance of said lease and the balance of the reversionary interest in the marble on lots numbers 3, 36 and 322, an offer to sell his interest to the defendant at about the same rate defendant had agreed to pay for the interest agreed to be conveyed by Wm. and F. C. Tate; that said agreement and promise made by F. C. Tate constituted part of the consideration for the notes, and that no such offer had ever been procured by F. C. Tate. Because of the failure of consideration pleaded, defendant prayed a rescission of the contract of Feb. 11th, 1891, and for judgment against the plaintiffs for $1,000 paid by him on said contract, with interest at seven per cent. per annum from the date of payment, to wit: Feb. 11th, 1891. By agreement of counsel and an order of court the two cases were tried together. Plaintiffs put in evidence all the notes sued on, and the contract of Feb. 11th, 1892. The defendants put in evi--

dence the Clements lease contract of March 27th, 1884, and
the contract of Feb. 11th, 1891. J. P. Harrison was intro-
duced as a witness in his own behalf, and testified as fol-
lows: When he made the trade with the Tates and gave the
notes sued on, spearate valuations were placed on the lands
and the marble interests by him and the Tates. The Tates
knew he intended to use the conveyances that they were to
make to him, for the purpose of raising money to pay the
notes. He had no other means to pay the notes, and the
Tates knew it. There was an agreement between him and
the Tates that the conveyances mentioned in the first con-
tract between them were to be made before the notes were
paid. There was an understanding between the parties, con-
temporaneously or subsequently to the making of the second
contract, as to what was meant by the word "lands," where
said contract provides that the title to the "lands" described
in the first contract shall remain in the Tates until the notes
given therefor are fully paid. (The witness offered to
testify as to what such understanding or agreement was,
but the court would not allow him to do so.) By the second
contract the marble interest was to be conveyed to him and
the guaranty given to him. The title to the wild lands, as
he called them, was to be held by Tate, because of the fact
that Tate's residence was on one of the lots. Tate was to
have the right, also, to use the wood. The witness did not
care particularly about the titles to the lands last mentioned
remaining in Tate, as the same did not amount to much.
Wild lands would sell there for from one to five dollars an
acre. There was no marble in those lands to which Tate
was to reserve title. The understanding referred to was be-
tween witness and the Tates, as well after as before the sign-
ing of the contracts. The same agreement continued after-
wards, all the while. The witness had numerous interviews
with Mr. Tate after the execution of the second contract.
William and F. C. Tate have never assigned and transferred
to witness the interest in the lease of the marble in the lots

specified in the contracts, nor executed to him the guaranty
of $1,200 per annum during the continuance of the lease,
nor executed to him conveyances of the reversionary inter-
ests in the marble specified in the contract, nor conveyed to
him by warranty deed the lands described in the contract, nor
made to him a quitclaim to the lands that, under the con-
tract, were to be quitclaimed. At two different times, be-
fore and after the making of both contracts, he had an agree-
ment with F. C. Tate as to securing witness a deed to the
other rights or interest of S. C. Tate in these lands and the
marble interest. F. C. Tate has never secured or presented
to him the offer of S. C. Tate to sell the other marble at the
same rate as agreed on with the others. On cross-examina-
tion, he further testified: As to the agreement he had with
Carter [F. C.] Tate, in a conversation had after making
the second contract, Tate distinctly said that he would en-
deavor to secure the fractional interest that was held by Mr.
Stephen [S. C.] Tate, that he would secure that interest
held by Steve Tate, which he knew it was necessary for wit-
ness to have before witness could pay the notes; that he
would secure an offer from Steve Tate, if possible to do so,
before the maturity of those last notes, and, in case he failed
to do so, the trade was immaterial with him and it could be
cancelled by the fall of that year. The contract was given
in March or April, somewhere along there, and he said if he
failed to secure the option by the fall of that year, that the
contract would be cancelled as it was immaterial. We dis-
cussed his retaining the homestead land on which he resided
and the farming interest and the fire wood that he wanted to
get off of it. He said that he would cancel the contract in
November of that year. We discussed the conveyance of
the reversionary interest of that mineral, in other words,
that the contract be carried out. This conversation about
the mineral interest was about the mineral interest he agreed
to convey to me. It was to be transferred and assigned at
once, on the execution of the last contract. Q. Did he say

so? A. That is my recollection of the understanding we had all along. Mr. Tate knew, quite as well as I did, that I was insolvent and could not pay him $500, to save my life, on those notes; and that is the reason why the transfer would have to be made. My memory is refreshed as to what occurred between Mr. Tate and myself after the execution of this last contract. The understanding between us was that, these notes being for a large sum of money, this agreement was not to be enforced, nor the notes put out for collection, in case I failed to secure the interest of S. C. Tate.

On motion of plaintiffs' counsel, the court ruled out all the testimony of James P. Harrison, and directed verdicts for plaintiffs in both cases. Defendants made a motion for a new trial, it being agreed that one motion for a new trial could be made to cover both cases. The motion was overruled, and defendants excepted.

1. The defense in each of these two cases depended upon the real meaning of the contract made Feb. 11th, 1892, construed in connection with the one made Feb. 11th, 1891. By reference to this last mentioned contract, it will be seen that William and F. C. Tate agreed therein, (1) to assign and transfer to James P. Harrison all their interest in the royalty under the Clements lease; (2) to guarantee to him that the profits from the royalty to be assigned would amount to $1,200 annually during the continuance of the lease; (3) to convey to him, by warranty deed, all their reversionary estate in the marble, except 2-21 parts of the marble in lot 36, to which they were to give him a quitclaim; and (4) to convey to him, by warranty deed, an undivided half interest in certain non-mineral lands in Pickens county. The contract then declares that "the consideration of the above agreements is that the said Harrison has already paid the sum of $1,000," and is to give certain notes. The payment of the money and the giving of the notes are not stated to be in consideration of the sale and conveyance of the non-

mineral lands, the reversionary estate in the marble and the royalty, with a warranty as to its profits, but, by the language of the contract, this payment and the giving of the notes seem to have been the consideration for the Tates' *agreement* to sell and convey all the properties described. And if this be true, then the payment of the money by Harrison, and the execution and delivery of the conveyances with warranties by the Tates, were intended to be concurrent acts. The beginning of the second contract is significant. It was made Feb. 11th, 1892, just a year after the first was executed, when both parties had had ample time to consider every feature of their bargain and each to fully understand whether or not the other had complied with all the obligations undertaken in the first contract. The first sentence begins, "Whereas William and F. C. Tate *agreed to sell* [italics ours] to Jas. P. Harrison certain marble and other interests," etc. If the first contract was in fact a sale; if under its terms the parties intended that the Tates, in consideration of the payment of the one thousand dollars and the giving of the notes by Harrison, should, before the notes were paid, execute and deliver to him an assignment of the royalty, with a warranty as to its profits, and warranty deeds to the reversionary interest in the marble and to the non-mineral lands, why did they in this last contract designate the first contract as an agreement to sell? Whatever may have been the intention of the parties in the first contract as to when the Tates should convey the properties described therein to Harrison, whether it was to be done upon the payment of the one thousand dollars and the giving of the notes, or upon the payment of all the notes, we are of opinion that there is no ambiguity on this point in the last contract. For here it is provided that "the title to the lands described in said contract of Feby. 11th, 1891, shall remain in William and F. C. Tate *until all the notes given therefor are fully paid.*" (Italics ours.) It is evident that the word "lands" as here used relates to the entire consideration of the notes;

for we find in other parts of this contract the expressions, "said notes being the purchase money for said land," and "said notes given for said land." It is therefore manifest that the parties, in agreeing that "the title to the lands described in said contract of Feb. 11th, 1891, shall remain in Wm. and F. C. Tate until the notes given therefor are fully paid," intended to provide for the reservation of title by the Tates to all the subject-matters of the contracts to which the Tates at the outset had title, viz: the royalty, the reversionary interest in the marble, and all the other lands, until all the notes should be paid. While the Tates could not retain title to an unexecuted warranty, still the warranty was part of the consideration of the notes and most likely would have been included in the assignment or transfer of the royalty. It would certainly be rather an anomalous proceeding to execute and deliver a warranty of the royalty while retaining title to the royalty itself. The last contract being free from ambiguity, parol contemporaneous evidence to explain the same was not admissible. There was no sufficient or satisfactory evidence that subsequently to the execution of the last contract any new and distinct agreement was made between the parties. The evidence ruled out only tended to show the contemporaneous, or subsequent, construction given to the written contract by the parties, and the rule is that such evidence is not admissible when the meaning of the contract is clear and unambiguous.

2. The court below properly construed the instruments in question, and committed no error in ruling out the oral evidence and directing verdicts in the plaintiffs' favor.

*Judgment in each case affirmed. All the Justices concurring.*